UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JULIAN JACKSON | * CIVIL ACTION |
| | * |
| VERSUS | * NUMBER: 16-13506 |
| | * |
| UPS GROUND FREIGHT, INC. | * JUDGE: |
| | * |
| | * MAG. JUDGE: |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

COMPLIANT

Plaintiff, Julian Jackson (Jackson sometimes hereinafter)**,** is a citizen of the United States of America and a resident of the Parish of Orleans, State of Louisiana and for causes of action alleges as to the defendant(s) as follows:

**1.**

Made defendant herein UPS Ground Freight, Inc. (UPS Freight, or UPS sometimes hereinafter), on information and belief a foreign corporation organized in the state of Virginia and having its principal place of business in Atlanta, Georgia, and licensed do and doing business in the Parish of Orleans, State of Louisiana.

**2.**

Jurisdiction is vested in this court pursuant to 28 U.S. Code Section 1331 as there are matters that arise under federal laws of the United States, Title VII of the Civil Rights Act of 1964 and 1991, as amended, Section 701 et seq. and all anti-discrimination provisions and 42 U.S.C. § 2000e et seq., ("Title VII), 42 USC 1981 42and reasonable attorney's fees as part of the costs pursuant to 42 U.S.C.A. § 1988.

**3.**

Julian Jackson is an African American male with a bachelor of science in accounting from Southern University at New Orleans has been driving commercial vehicles since 1998, about 18 years, and working in the freight industry about 25 years.

**4.**

In April 2006, Julian Jackson was hired as a driver by United Parcel Services of America, Inc. – UPS Ground Freight (UPS Freight, sometimes hereinafter).

**5.**

Since 2012, Julian Jackson has been constantly subjected to discrimination, harassment, and a hostile work environment by terminal managers at UPS Freight.

**6.**

Between April 1, 2012 to July 5, 2012, Mike Lee (WM) UPS Fright terminal manager, subjected Jackson to constant harassment, discrimination, a hostile work environment and terminated him on July 5, 2012, so, charges of discrimination were filed on July 23, 2012 with the Equal Employment Opportunity Commission, EEOC Charge No. 461-2012-01567.

**7.**

In 2012, before Mike Lee terminated Jackson, Rogest Montegue informed Jackson that Mike Lee was sabotaging his route which gave Lee an excuse to write Jackson up for untimely deliveries.

**8.**

Jackson appealed the discharge and had to be reinstated after filing the EEOC charge and a hearing with the union and UPS.

**9.**

Jackson returned to work on or about October 1, 2012, and after he returned to work, he was constantly harassed and retaliated against by Mike Lee (WM) and his replacement, Chris Rivette (WM), terminal manager, then later by his replacement, Thaddeus Theriot (BM), terminal manager, who had only been in the position for about two months; when, he terminated Jackson on December 9, 2014.

**10.**

After Julian Jackson returned to work in October 2012, he was subjected to constant harassment and a discriminatory, retaliatory hostile work environment in the following nonexclusive particulars:

a) Julian Jackson was assigned to a congested city route that required him to drive a small trailer truck.

b) Several times in 2013 and 2014, Chris Rivette (WM), terminal manger, assigned Jackson, through supervisors, to larger trailer trucks that were not conducive to a congested city route, uncomfortable to drive, and exposed him to a greater risk of accidents.

c) At UPS Freight, routes were selected by seniority and a bid process; however, after October 2012, Jackson's bided route was routinely dissolved, forcing Jackson to take a route he was not contracted to make and designed to make him uncomfortable; although before management was forced to return Jackson to work in October 2012, his route was almost never shut down, and on the rare occasion that it was changed prior to October 2012, the terminal manager rotated route shut-downs between drivers.

d) After returning in October 2012, Jackson's route trailer was regularly loaded wrong, forcing him to unload and reload the trailer; therefore, delaying his departure, and despite complaints to the terminal manger, nothing was done.

e) In driver meetings, Kris Daniels (BM), dispatcher/ assistant terminal manger, acknowledged that Jackson's route was intentionally loaded wrong, but that's the way Mike Lee instructed them to load his truck, and it became obvious that Lee was setting Jackson up to fail.

f) Damages were made to Jackson's assigned tractor trailer by other UPS Freight employees; however, despite reports by Jackson to Chris Rivette (WM), terminal manager, he refused to investigate in accordance with company policy to determine who had the vehicle before Jackson and caused the damage, but he required Jackson to take the truck to the shop and have it straightened out.

g)   Mike Lee (WM) misrepresented the character and attendance of Jackson and sent UPS inaccurate, false, and misleading information on him in a certified letter to he and UPS referencing a warning letter about him meeting with him about unacceptable attendance; however, Lee never met with Jackson even one time about unacceptable attendance, and when Lee was questioned in the presence of Troy Stephens (WM), driver, Lee could not name one time that he had met with Jackson about unacceptable attendance; then admitted that he had printed the letter from a standard form off the computer, but he left the inaccurate he letter in Jackson's personnel file to damage his work record.

h) UPS driver Frank Amato (WM) told Jackson after his 2012 termination, that he had observed that UPS was only firing black drivers and harassing black drivers, and he said "this is racism" and suggested that Jackson go to EEOC.

i) UPS driver John Scott told Jackson that UPS terminal manager Mike Lee (WM) cannot handle an educated black man.

j) Steve Sorrell also told Jackson that UPS terminal manager Chris Rivette tried to fire him under false pretenses.

k) For the six years that Julian Jackson worked at UPS Freight, before Mike Lee became terminal manager, Jackson had never been cited or reprimanded by the previous terminal manager for unacceptable attendance.

**11.**

On August 14, 2014, Julian Jackson received a right to sue letter from the EEOC for Charge No. 461-2012-01567 that gave him 30 days from receipt to sue UPS on or about November 14, 2014.

**12.**

Although Jackson was being subjected to a hostile work environment and acts that he deemed retaliatory, he had been reinstated, paid back pay, not been suspended, or terminated again, and had not lost any wages; so, he decided not to file a lawsuit after receiving the right to sue letter.

**13.**

However, less than 30 days after UPS realized that Jackson opted not to file suit on EEOC Charge No. 461-2012-01567, he was terminated on December 9, 2014.

**14.**

In the fall of 2014, Thaddeus Theriot (BM) replaced Mike Lee (WM) as terminal manager; so, Jackson thought the harassment would stop, but later learned that Thaddeus Theriot was a figure head being controlled by Lance Laurent (WM), Labor Manager, and the retaliation, harassment,

disparate treatment continued after Jackson failed to file suit against UPS on the first charge of discrimination.

### 15.

The week before Jackson was terminated, Jackson was delivering a 2000 lb. freight and was told by the customer that they couldn't take it for an hour. When Jackson called Kris Daniels (BM), dispatcher, he told Jackson to return to the terminal; so, he returned to the terminal to have the load unloaded, as directed and was on the dock helping to unload it, but there is nowhere to enter the return t terminal on the computer. Despite the fact that the UPS computer system does not show return to the terminal, unless all loads have been delivered on the truck, a few days later, Jackson was attacked by Thaddeus Theriot, terminal manager, for dead time.

### 16.

On Monday, December 8, 2015, the day before Jackson was terminated, he was called to the terminal manager's office about delays that were beyond his control.

### 17.

On Tuesday, December 9, 2014, Jackson brought it to the attention of his immediate supervisor, Rogest Montegue (BM) ("Ro") that the load on his truck was loaded backwards again, and Ro directed Jackson to reload the freight correctly before leaving.

### 18.

Kris Daniels (BM), assistant terminal manager/dispatcher, had observed the harassment and retaliation and had told Jackson that he noticed that despite what was going on with his truck being loaded incorrectly, Jackson was one that did not argue about his freight not being loaded properly and just reorganized it; so, he commended Jackson on this, and Jackson responded that he didn't because he had a job to do and respected the workers on the dock.

**19.**

Other drivers, including Rodger Coney (BM), commented to Jackson how they observed that he was one of the only drivers that never fussed and cussed when his trailer was loaded wrong.

**20.**

In the process of Jackson reloading the freight, Thaddeus Theriot (BM) came in the trailer and scolded him for reorganizing the truck; although his immediate supervisor, Ro Montegue, had authorized the reload. The terminal manger began fussing at Jackson for reloading the truck and told him to leave with the freight and reorganize it on the dock of one of the customers that Jackson would be delivering to that day.

**21.**

Having been in the freight delivery business for nearly 25 years, Jackson was well aware that customers do not want UPS drivers tying up their docks; when, they make deliveries, want the UPS delivery dropped off, and UPS trucks to move on for other trucks making deliveries; so, Jackson tried to explain this to Theriot.

**22.**

Theriot, terminal manager, then, ordered Jackson to come to his office.

**23.**

Jackson agreed to the directive of his immediate supervisor but requested that in accordance with the national labor union agreement and his membership in International Brotherhood of Teamsters, Local Union 270 that he have a union representative of Jackson's choosing present.

**24.**

However, Theriot, terminal manager, insisted that Jackson bring Troy Stevens (WM), shop steward, into the meeting as his union representative.

**25.**

Due to Jackson's past knowledge and experience, he knew that management preferred to have Stevens (WM) in the meetings because Stevens more often than not sided with management and against the drivers.

**26.**

To confirm that he had the right to have a representative of his choosing present, before he met with the terminal manager, Jackson called Abe Serta (WM) at the local union, and he confirmed that Jackson had a right to choose his representative and that Jackson should request a waiver form to waive the union steward being in the meeting.

**27.**

Theriot, terminal manager, did not have the waiver form; so, Jackson had to go to Kris Daniels, assistant terminal manager/ dispatcher (BM), and he gave Jackson the waiver form.

**28.**

In accordance with the Union/UPS labor agreement procedure, Jackson signed the form and brought it to the office of the terminal manager; who, then, told Jackson that he no longer wanted to talk to him because he had talked to Lance Laurent, (WM) Labor Manager, and he had directed Theriot to fire Jackson.

**29.**

It became apparent that Theriot did not have independent decision making authority and that Thaddeus Theriot (BM) was a figure head being controlled by Lance Laurent (WM), Labor Manager.

**30.**

Since there was no reason for the termination, the union hall representative contacted Theriot, terminal manager, who would only allege that the termination was for adverse behavior.

**31.**

Jackson later received a letter dated December 10, 2014 that falsely alleged a meeting had occurred and that Jackson was being terminated as discussed at the meeting for "offenses of extreme seriousness", and the letter gave no further explanation.

**32.**

Jackson was targeted by management, and subjected to a hostile work environment and retaliation for three years after filing an EEOC charge for racial discrimination against UPS and never provided a specific detailed reason for his termination; so, Jackson can only assume that the pretext reason that Lance Laurent (WM), Labor Manager directed Theriot to terminate him was regarding the exchange that he had with terminal manager, Theriot, about loading the truck on a customer's dock and exercising his right to have a union representative of his choosing present at a meeting with the terminal manager.

**33.**

Although there were four (4) to five (5) drivers that were willing to appear at the UPS and labor union hearing to speak about how Caucasian drivers constantly argued with and cursed out management but were not terminated, Keith Porter (BM) called Jackson at home, after his termination, to advise that the union and management were conspiring against him and that the

union and management would not allow Jackson to get statements or call witnesses to testify about the disparate treatment between black and white drivers.

### 34.

However, UPS management got statements from other employees and used them against Jackson at the hearing.

### 35.

The retaliation, harassment and hostility towards Jackson by UPS management continued during the labor and management hearing; in fact, Jackson's first union/management hearing was scheduled for 9:00 a.m. and Lance Laurent (WM), Labor Manager, management, conspired with the union to push the meeting back to 1:00 p.m. after all drivers that could have testified for Jackson left the terminal; so, Jackson objected to the hearing being rescheduled to 1:00 p.m.

### 36.

The labor/management hearing was rescheduled for another day at 9:00 a.m., and again management and the union conspired to delay the hearing until about 10:30 a.m. after drivers that could have spoken about the disparate treatment of black and white drivers were gone on their routes.

### 37.

Multiple employees advised Jackson that he was being targeted by management including the following:

a. Teamster 270 business manager, Steve Sorrell (WM) told Jackson that he was being targeted by UPS management and that "UPS don't give a f*** about you".

b. Drivers, Edward Cooper, Joe Jones, and John Scott told Jackson that they were aware that he was being targeted.

    c. Kris Daniels (BM), assistant terminal manage/dispatcher, told Jackson that he was targeted by UPS Freight and that they were out to get him. Kris Daniels confirmed this statement.

    d. In January 2015, in the local union meeting, in the presence of UPS Management and Union Hall representatives, Kris Daniels (BM), assistant terminal manage/dispatcher, acknowledged that Jackson was being targeted by UPS management.

**38.**

There is a pattern and practice of UPS terminal managers and labor mangers, applying UPS policies differently to African American employees then to Caucasian employees.

**39.**

The harassment and hostile work environment was so evident to Jackson and other African American drivers that on two occasions, fellow driver, Robert Bird (BM) commented that the black drivers needed to file a racial discrimination lawsuit.

**40.**

Since being employed at UPS, Julian Jackson has observed and been told about observations of others how black drivers are treated differently from similarly situated white drivers, including but not limited to the following situations:

    a. Jackson has observed how black drivers are constantly called into the office and written up and white drivers are called in far less, and even Rogest Montegue, Jackson's former supervisor, confirmed to Jackson that black drivers were definitely called into the office more than white drivers.

b. Frank Amato (WM) driver even nick named Darren Bourg (WM), driver, "Rottweiler" because of Darren's loud belligerent behavior always cussing and fussing with management about his freight.

c. Many other drivers, including but not limited to Kelvin Isaac (BM), Robert Bird (BM), Keith Porter (BM), Joe Jones (BM), John Scott (BM), Roderick "Roger" Coney (BM), and Kenneth Douglas (BM), witnessed Darren Bourg (WM) and Timmy Dodd (WM) constantly fussing about their load being incorrectly loaded and even cursing at management; yet, the Caucasian employees were not suspended or terminated for their belligerent behavior.

d. Jackson also witnessed the belligerent behavior of Darren Bourg (WM) and Timmy Dodd (WM) constantly fussing about their load being incorrectly loaded and even cursing at management; yet, the Caucasian employees were not suspended or terminated for their belligerent behavior.

e. On one occasion, Jackson even witnessed Timmy Dodd (WM) driver, throwing his clip board on the counter in the office because he was so upset that his load was incorrectly loaded. He did this in the presence of office employees.

f. Additionally, Raymond Green (BM) dock worker, and Dwayne Williams (BM), former dock worker, have shared observations of how Darren Bourg (WM) and Timmy Dodd (WM) drivers frequently fussed and cursed about their loads be loaded incorrectly.

g. Mike Lee recommended Jackson's termination on July 5, 2012 for allegedly having an unreported accident/damage to my truck; although Jackson did not have an accident, noticed damage to the truck, and self-reported the damage; however, Caucasian drivers have had accidents, damaged company trucks, lied, and no action was taken against them.

h. Timmy Dodd (WM), driver, wrecked a tractor truck under Joe Redding (WM) terminal manager; yet, no suspension or termination was applied to this driver by UPS.

i. Kenny Bischoff (WM), driver, wrecked a trailer under Mike Lee (WM) terminal manager; yet, no suspension or termination was applied to this driver by UPS.

j. Troy Stephens (WM), driver, wrecked a tractor truck twice in one week, under Chris Rivette (WM) terminal manager. Troy did not report the first wreck until two days after the wreck; yet, no suspension or termination was applied to this driver by UPS.

k. Allen Freeman (WM), driver, had four accidents in a short period, under Chris Rivette (WM) terminal manager; yet, no suspension or termination was applied to this driver by UPS.

l. Charlie Wraggie (WM), driver, had an accident, under Chris Rivette (WM) terminal manager; yet, no suspension or termination was applied to this driver by UPS.

m. When Chris Rivette (WM) was terminal manager, Troy Stephens (WM), driver, punched Raymond Spicuzza, Jr. (WM), driver. Fighting among employees is grounds for immediate termination according to UPS policy; however, no suspension or termination was applied to these drivers by UPS.

**41.**

For about a year after Jackson's December 2014 termination, he tried to find permanent employment and learned that former UPS terminal manager, Mike Lee (WM), had retaliated against him by calling other freight companies to tell them not to hire him.

**42.**

Dwayne Williams told me that drivers from R & L told him that Mike Lee called their had terminal manager and told him not to hire Julian Jackson if he called looking for a job.

**43.**

Jackson applied to several employers based on the representation by dispatchers that they need drivers, but when he put in applications and showed up, he was constantly told that the positions are filled, or we are not hiring.

**44.**

In 2015, Jackson went to Saia Freight based on a lead from a dispatcher, Clarence, that Saia Freight was hiring and needed about four (4) drivers, and when, I put in an application and went for an interview with the terminal manager, he confirmed that that they were hiring; then, later he was told that all positions had been filled.

**45.**

The retaliatory conduct continued to be an issue with Jackson's ability to find permanent employment.

**46.**

At all times, Julian Jackson was qualified for his job.

**47.**

The pattern and practice of Thaddeus Theriot (BM), terminal manger, conspiring and being controlled by Lance Laurent (WM), Labor Manager and the continued impact of retaliatory conduct of Mike Lee (WM), employees and agents of UPS, against Plaintiff, Julian Jackson, constitutes unlawful discriminatory and retaliatory employment practices.

**48.**

The employer(s), UPS, is responsible for its employees and agents under the doctrine of respondent superior.

**49.**

On May 4, 2016, the U. S. Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights letter in connection with Charge No 461-2015-02061 that specifically notes the allegations charged as continuing violations. (See Exhibit "1")

**50.**

The basis for the EEOC complaint, alleged violations of federal and state causes of action are as follows:

a. Being subjected to different terms and conditions of employment;

b. Creating a hostile work environment;

c. Harassment;

d. Retaliation for complaining of discrimination and retaliation;

e. Giving a pretextual reasons for discrimination, retaliation, creating a hostile work environment and, harassment;

f. Any and all other violations of the Civil Rights Act, and acts of conspiracy, intentional discrimination, harassment, and retaliation that may be proven at the trial of this matter.

**51.**

As a result of the wrongful discrimination, retaliation, harassment, and hostile work environment, Julian Jackson has sustained significant emotional distress, loss of enjoyment of life, mental anguish, loss of benefits, loss of earnings, and any and all damages allowed by law.

**FIRST CAUSE OF ACTION**

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND 1991, AS AMENDED, SECTION 701 ET SEQ. AND ALL ANTI-RETALIATION PROVISIONS OF

## 42 U.S.C. § 2000E ET SEQ.

**52.**

Plaintiff realleges and incorporates herein by reference paragraphs 1 through 51 of this complaint and incorporates the same as though fully set forth herein.

**53.**

The pattern and practice of discrimination, harassment, and retaliation against Plaintiff, Julian Jackson (BM), violated *Title VII of the Civil Rights Act of 1964 and 1991 as amended, 42 U.S.C. § 2000e et seq., which prohibits* discrimination against any person with respect to terms, conditions or privileges of employment because of an individual's race, color, religion, sex, or national origin and prohibits retaliatory conduct for participating in protected activity.

**54.**

As a result of the violations of the Civil Rights Act of 1964 and 1974, as amended, Julian Jackson (BM) is entitled to back pay, reinstatement or front pay and or compensation for all employee benefits lost as a result of the violations of the Civil Rights Act of 1964 and 1991, as amended, attorney fees and costs, as well as compensatory and punitive damages in accordance with applicable law.

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1981

**55.**

Plaintiff realleges and incorporates herein by reference paragraphs 1 through 51 of this complaint and incorporates the same as though fully set forth herein.

**56.**

The pattern and practice of discrimination, harassment, and retaliation against Plaintiff, Julian Jackson (BM), violated 42 § 1981 which states that every person in the United States shall have the same rights as white citizens regarding "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship."

**57.**

As a result of the violations of 42 § 1981, Julian Jackson (BM) is entitled to back pay, reinstatement or front pay and or compensation for all employee benefits lost as a result of the violations 42 § 1981, attorney fees and costs, as well as compensatory and punitive damages in accordance with applicable law.

**THIRD CAUSE OF ACTION**
**LA.-R.S.A 23:301 ET SEQ.**

**58.**

Plaintiff realleges and incorporates herein by reference paragraphs 1 through 51 of this complaint and incorporates the same as though fully set forth herein.

**59.**

La.-R.S.A 23:301 et seq., LSA-R.S. 23:312, that prohibits discrimination against any employee on the basis of race and provides that an employer may not fail or refuse to hire, or to discharge, any individual or otherwise discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment because of the individual's age or limit, segregate, or classify his employees in any way which would deprive or tend to

deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of the individual's race.

**60.**

As a result of the violations of La.-R.S.A 23:301 et seq., LSA-R.S. 23:312, Julian Jackson is entitled to compensation for all violations of law, reinstatement, promotion, past physical pain and suffering, future physical pain and suffering, medical expenses, loss of earnings, loss of future earnings, loss of earning capacity, loss of enjoyment of life, permanent disability to the body, compensatory and punitive damages, attorney fees and costs, together with expert witness fees and legal interest, damages in accordance with applicable law.

## FIFTH CAUSE OF ACTION
## LA. REV. STAT. ANN. 51:2256

**61.**

Plaintiff realleges and incorporates herein by reference paragraphs 1 through 51 of this complaint and incorporates the same as though fully set forth herein.

**62.**

La. Rev. Stat. Ann. 51:2256 makes it unlawful for an employer to retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by Title 23 of the Louisiana Revised Statutes of 1950, as amended or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing of Title 23 of the Louisiana Revised Statutes of 1950 as amended.

**63.**

As a result of the violations of law, Julian Jackson is entitled to compensation for all violations of law, reinstatement, past physical pain and suffering, future physical pain and suffering, medical expenses, loss of earnings, loss of future earnings, loss of earning capacity, loss of enjoyment of life, permanent disability to the body, compensatory and punitive damages, attorney fees and costs, together with expert witness fees and legal interest, damages in accordance with applicable law.

**64.**

Julian Jackson is entitled to and prays for trial by jury.

**WHEREFORE**, petitioner, **Julian Jackson** prays that the defendant, **UPS Ground Freight, Inc.**, herein be served with a copy of this Complaint and that they be duly cited to appear and answer same, and that after due proceedings had there be Judgment in favor of your petitioner, **Julian Jackson** against defendant, **UPS Ground Freight, Inc.**, for the sum of all damages as may be proven by the plaintiff in this matter, all reasonable compensation, for all losses and damages allowed pursuant to law, together with legal interest thereon from the date of judicial demand until paid and for all costs of these proceedings including expert witness fees. Petitioner further prays for all general and equitable relief as the nature of the case may permit and that there be trial by jury.

RESPECTFULLY SUBMITTED,

/s/ *Wanda Anderson Davis*

_____
**WANDA ANDERSON DAVIS #16788**
**Leefe, Gibbs, Sullivan, and Dupre', L.L.C.**
**3900 North Causeway Blvd., Suite 1470**
**Metairie, LA 70002**
**Telephone: (504) 830-3990  Facsimile: (504) 830-3998**
**Email: wadavis@leefegibbs.com**
**Attorney for Plaintiff**

**Service to Be Made**
UPS Ground Freight, Inc.
Through its agent for Service of Process
Corporation Service Company
Bank of America Center, 16th Floor
1111 East Main Street
Richmond VA 23219